**The court incorporates by reference in this paragraph and adopts as the findings and analysis
of this court the document set forth below. This document has been entered electronically
in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated: August 22 2007**

_____
Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 05-30629 |
| | ) | |
| Iesha T. Chapman, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 05-3144 |
| | ) | |
| State Farm Fire & Casualty Co. | ) | Hon. Mary Ann Whipple |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Iesha T. Chapman, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OF DECISION

This adversary proceeding is before the court for decision after trial on a complaint filed by Plaintiff State Farm Fire & Casualty Co. ("State Farm") to determine the dischargeability of a debt allegedly owed to it by Defendant/Debtor Iesha T. Chapman. State Farm alleges that the debt should be excepted from discharge under 11 U.S.C. § 523(a)(6) and/or (a)(9).

The court has jurisdiction over this adversary proceeding under 28 U.S.C. §1334(b) and the general

order of reference entered in this district. Proceedings to determine dischargeability of debts are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I). This Memorandum of Decision constitutes the court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that any debt owed by Defendant to State Farm is dischargeable.

## FINDINGS OF FACT

The parties' dispute arises out of State Farm's obligation to compensate its insured, Laketisha Floyd ("Floyd"), for personal injuries sustained by her on July 16, 2003, when she was struck by a motor vehicle driven by her cousin, Defendant/Debtor Iesha Chapman ("Defendant"), and its resulting position as subrogee of Floyd's rights against Defendant to the extent of $55,000. At trial, both Floyd and Defendant testified. Their testimony, together with the testimony of witnesses Dolisha Hood ("Hood"), offered by Plaintiff, and Harrison ("Jack") Penn ("Jack"), offered by Defendant, presented versions of events that occurred on July 16 that, although similar, conflicted in certain material respects. Having carefully reviewed the testimony of each witness, the court finds it is more likely than not that the following events occurred.

On July 16, 2003, at approximately 11:00 a.m., Defendant, 19 years old at the time, arrived in her car at the home of Tyisha Stewart ("Stewart") and Hood located at 1420 Addington, Toledo, Ohio. Floyd, then 16 years old, and Floyd's boyfriend were also at the house that morning. The young women were preparing to go shopping at a local mall. Floyd testified that while at Stewart's house, she observed Defendant, as well as others, smoking marijuana. Before leaving for the mall, Defendant asked Floyd's boyfriend for money that he owed Defendant. Floyd became angry with Defendant and told her not to ask her boyfriend for anything. Nevertheless, Floyd's boyfriend did repay Defendant.

Defendant, Floyd and Stewart arrived at the mall in Defendant's car between 12:00 and 1:00 p.m. and left approximately two hours later. Before leaving, Defendant bought lunch for herself. Floyd had no money and did not buy any food. However, after getting into Defendant's car to leave the mall, Floyd reached into Defendant's bag of food for something to eat. Defendant testified that she would not allow Floyd to share in the food since she became angry at her earlier when Defendant asked Floyd's boyfriend

2

for the money he owed her. Defendant grabbed the bag away from her and told Floyd, "Don't go in my bag. Now, you have no money, and you're hungry." Floyd again became angry and told Defendant she was going to "kick [her] ass." At that time, Defendant insisted that she get out of the car. When Floyd refused, Defendant got the attention of a police officer patrolling the mall parking lot and explained the situation to him.[1] The officer then removed Floyd from Defendant's car. Floyd had a friend pick her up at the mall and she returned to the Addington home. Floyd was admittedly upset and angry at Defendant as a result of this altercation.

Defendant returned in her car to the Addington home around 7:00 p.m. in order to pick up Stewart. She and Stewart had planned on going to Detroit for the evening. Shortly before her arrival, Jack stopped by the Addington home. Jack is also Defendant's cousin but is not related to Floyd. Jack testified, which testimony the court finds credible, that Floyd was still at the house and was talking about beating Defendant up when Defendant arrived. On Defendant's arrival, she parked in the street in front of the Addington home. Jack and Stewart went to Defendant's car and were talking to her through the window on the driver's side. Then began the multiple altercations that ultimately resulted in Floyd's serious injuries.

Floyd came up behind Stewart and threw a punch at Defendant through the open window, a punch Floyd admits was a "cheap shot." After the punch was thrown, Defendant reached for a container of mace and sprayed the mace towards Floyd. Defendant then got out of her car and round one of a three round fight began in the street amidst a crowd of ten to twenty onlookers. The first fight lasted a couple of minutes and onlookers eventually pulled the young women apart. However, Floyd was not content and continued the fight, which moved toward the curb and ended with Defendant on top of Floyd. By all accounts except Floyd's, Defendant prevailed in both fights. Defendant then got up and began walking to her car. At this point, the stories of those who testified at trial diverge.

Floyd testified that she had fought with her eyes closed after being maced and that Defendant had pulled Floyd's shirt and bra off of her during the fight. Floyd testified that after the second fight, she then went into the house, washed her face and put on a t-shirt. She testified that she could then see much better. She walked out of the house one to two minutes later after picking up a brick from inside the house. She testified that she was very upset and she intended to use the brick to hit Defendant. Floyd testified that

---

[1] Floyd's version of the mall altercation is somewhat different. She testified that they had left the mall parking lot and were driving down the street when Defendant told her to get out of the car. According to Floyd, when she refused, Defendant called the police and drove back to the mall parking lot where they were met by a police officer who then removed Floyd from the car. The court find Defendant's version of events as set forth above more credible. While this altercation is not the altercation that resulted in Floyd's injuries, the court finds the factual discrepancy together with other inconsistencies in Floyd's rendition of events that day relevant as to her credibility.

3

Defendant had gotten into her car and that Floyd headed towards the car with the brick but, when she was twelve to fifteen feet from the car, Jack knocked the brick out of her hand. According to Floyd, Hood then walked Floyd down the street two or three houses in order to calm her down. She was standing in the street next to a truck when Defendant's car hit her. According to Floyd, Hood was pushed out of the way of Defendant's car. Floyd testified that when she was hit, her right side was facing Defendant's car. She further testified that Defendant's car was moving slowly at approximately ten miles per hour and that she was not injured when initially struck by the vehicle. Floyd further testified that she landed on the hood of Defendant's car initially but that after approximately five seconds, Defendant suddenly accelerated, causing her to roll under the car. The tires of the car did not run over her.

Hood's testimony differs somewhat from Floyd's. Hood testified that after the first two fights, Defendant did not want to fight anymore and she got into her car. According to Hood, Floyd was standing in the middle of the street and was jumping around still wanting to fight. Hood testified that Floyd then found a brick and acted like she was going to hit either Defendant or her car with the brick. Hood also testified that Jack took the brick from Floyd and that Floyd was either in the street or on the curb at that time. However, when asked if she saw Jack knock the brick out of Floyd's hand, she responded uncertainly "A little – little bits of it." [Tr. at 81]. According to Hood, she then walked Floyd approximately one car length away from Defendant's vehicle. Hood testified that Floyd was standing in the middle of the street when Defendant started her car and hit Floyd. Hood testified that Defendant's car was traveling at 25 to 30 miles per hour when it hit Floyd, which is unlikely given her recollection that Floyd was about one car length from Defendant's car. Hood described the impact as follows: "It happened so quick. [Floyd] was in the front of the car, and then she went up underneath the car. . . . It wasn't like she was holding on for a period of time before." [Tr. at 80]. Finally, Hood testified that after the impact Defendant panicked and drove away without stopping.

Defendant and Jack present another version of events. According to Defendant, Floyd's shirt was torn but was not torn off. Both Defendant and Jack testified that, after the second fight, Floyd ran to Defendant's car and emptied Defendant's purse on the street. While Defendant picked up her belongings from the street and got in her car to leave, Floyd ran to the side of the Addington house, picked up a brick and returned to the street yelling "I'm going to f - - k you up." Jack testified that he did not take the brick from Floyd's hand and that Floyd was approximately four to five feet in front of Defendant's car acting like she was going to throw the brick at the windshield. At that time, Defendant testified that onlookers were standing behind her car and so, believing that Floyd was going to throw the brick, she started the car and

4

accelerated, hitting Floyd, in order to knock the brick out of her hand. According to Jack, Defendant accelerated quickly. Defendant testified that she could not avoid hitting Floyd and still leave the scene. She further testified that Floyd hit the hood palms down and flew back and under the car. According to Defendant, after the impact, she panicked and drove away from, and did not return to, the scene. Although Floyd and Hood testified that they saw Defendant smoking marijuana in her car some time before Floyd was hit, Defendant denies that she did so.

Having observed the witnesses who testified and after considering certain inconsistencies in the testimony, the court finds the version of events set forth by Defendant and Jack to more likely than not be what actually occurred on July 16, 2003.[2] Defendant did not overstate, understate or sugar coat her version of the day's unfortunate events. She flatly admits, for example, that she "punched the gas" on the car. The court does not credit testimony that Jack knocked the brick out of Floyd's hand as she headed toward Defendant's car. Instead, the court credits undisputed testimony that Floyd was the aggressor throughout the day, that Defendant did not want to fight any more and had retreated to her car after the second fight, and testimony that Defendant feared Floyd was going to throw a brick through her windshield. Hood acknowledged that Floyd was either back in the street or at the curb brandishing a brick at Defendant's car, but was hesitant in her testimony as to Jack knocking the brick out of Floyd's hand. Finally, the court credits Defendant's testimony, corroborated by Jack, that she could not back her car away from Floyd because onlookers were standing behind her car. All of the witnesses testified that the events on Addington that warm summer evening had attracted an audience. The court finds it more likely than not that the crowd continued to watch as Floyd jumped around in the street threatening Defendant but watched from a safe distance - i.e. behind Defendant's car.

Defendant was arrested later that evening. After a plea of no contest, she was convicted of attempt to commit felonious assault, in violation of Ohio Revised Code § 2923.02 (attempt) and 2903.11(A)(1)(felonious assault: "[n]o person shall knowingly... cause serious physical harm to another..."), in connection with the July 16 incident. In a pretrial motion for summary judgment on its claim brought under § 523(a)(6), Plaintiff relied on evidence of Defendant's conviction, which was also admitted at trial. [Plf. Ex. 1]. The court denied Plaintiff's summary judgment motion, finding that the state criminal conviction was not entitled to preclusive effect in this proceeding. [Doc. # 20].

---

[2] The court has also considered the fact that despite an instruction by the court not to discuss their testimony with anyone after leaving the courtroom, Hood and Floyd found it necessary to tell Jack, who was waiting in the hall outside the courtroom and testified after Hood and Floyd, that they had testified that he knocked the brick out of Floyd's hand. [*See* Tr. at 126-27]. That demonstrates to the court some effort at complicity in their stories on this critical point, an effort that casts doubt upon them.

5

**LAW AND ANALYSIS**

State Farm seeks a ruling that the debt allegedly owed to it by Defendant is nondischargeable under 11 U.S.C. § 523(a)(6) and (a)(9). These sections, which except from discharge debts for specific types of injuries caused by a debtor, apply even though the creditor was not actually injured but, rather, acquired the debt by subrogation. *Reitzel v. DeLong (In re DeLong)*, 228 B.R. 406, 407-08 (Bankr. N.D. Ohio 1998); *Kentucky Farm Bureau Mut. Ins. Co. v. Peppers (In re Peppers)*, 213 B.R. 956, 961 (Bankr. W.D. Ky. 1996); *State Farm Mut. Auto. Ins. Co. v. Mahlman (In re Mahlman)*, 136 B.R. 723, 726 (Bankr. S.D. Ohio 1992). A creditor must prove exceptions to dischargeability for individual debts under 11 U.S.C. § 523(a) by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291 (1991).

**I. 11 U.S.C. § 523(a)(6)**

Section 523(a)(6) provides that a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is not dischargeable. 11 U.S.C. § 523(a)(6). In order to be entitled to a judgment that the debt is excepted from discharge, Plaintiff must prove by a preponderance of the evidence that the injury from which the debt arises was both willful and malicious. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999); *J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 801-2 (Bankr. N.D. Ohio 2001). A willful injury occurs when "(i) the actor desired to cause the consequences of the act or (ii) the actor believed that the given consequences of his act were substantially certain to result from the act." *Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 307 (B.A.P. 6th Cir. 2004) (citing *Markowitz*, 190 F.3d at 464). Under § 523(a)(6), "'malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent." *Id.* (citing *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986)).

In this case, there is no dispute that Defendant believed that personal injury to Floyd was substantially certain to result from her act of driving her car into Floyd. Indeed, Defendant does not really contest this element. Thus, State Farm has met its burden of proving a willful injury. However, the facts do not support a finding that the injury was malicious. Nor does the evidence of Defendant's conviction of attempt to commit felonious assault determine the element of maliciousness, as a matter of preclusion or otherwise. Rather, as discussed above, Defendant reacted to a real threat of bodily harm by Floyd when Floyd was jumping around four to five feet in front of her car with a brick and yelling, "I'm going to f--k you up." Here, Defendant could not back up in order to move a safe distance away from Floyd because of the spectators standing behind her vehicle. Given the ongoing developments of the evening, the threat of a brick crashing through her windshield and striking her was imminent and reasonably required quick

6

action. Her stated intention, which the court believes, was to leave and "to get myself out of there." The court concludes that Defendant was justified in taking the action that ultimately caused her cousin Floyd's serious injuries. State Farm has failed to meet its burden of proving a malicious injury. *See Kleman v. Taylor (In re Taylor)*, 322 B.R. 306, 309 (Bankr. N.D. Ohio 2004) (explaining that acts properly taken in self-defense provide a valid defense to an action brought under § 523(a)(6)).

## II. 11 U.S.C. § 523(a)(9)

In order to prevail on its claim under § 523(a)(9), State Farm must demonstrate by a preponderance of the evidence that Defendant operated her vehicle while intoxicated as defined under state law at the time of the accident. *See Whitson v. Middleton*, 898 F.2d 950, 952 (4th Cir. 1990); *Simpson v. Phalen (In re Phalen),* 145 B.R. 551, 554 (Bankr. N.D. Ohio 1992); *Alge v. Mellott (In re Mellott)*, 187 B.R. 578, 582 (Bankr. N.D. Ohio 1995). Ohio Revised Code § 4511.19,[3] which prohibits driving while under the influence of alcohol or drugs as well as driving with certain concentrations of alcohol in bodily substances, describes "intoxication" for purposes of § 523(a)(9). *In re Mellott*, 187 B.R. at 582; *Allstate Ins. Co. v. Humphrey (In re Humphrey)*, 102 B.R. 629, 633-34 (Bankr. S.D. Ohio 1989).

There is no evidence that Defendant consumed alcohol at any time the day of the altercations between Floyd and Defendant. Instead, as evidence of Defendant's intoxication at the time she hit Floyd with her car, State Farm offers only the testimony of Floyd and Hood that they observed Defendant smoking marijuana in her car before she hit Floyd. Even if the court assumes that their testimony is true, there is no testimony regarding the amount of marijuana that Defendant smoked or other evidence from which the court could conclude that Defendant drove her vehicle "under the influence" of marijuana. The court finds, therefore, that State Farm failed to meet its burden of proof under § 523(a)(9).

## **CONCLUSION**

Finding that State Farm has failed to meet its burden of proof under 11 U.S.C. § 523(a)(6) and (a)(9), the court will, in accordance with this memorandum of decision, enter judgment in Defendant's favor.

---

[3] Section 4511.19, effective at the time of Debtor's offense, provided in relevant part as follows:
(A) No person shall operate any vehicle, streetcar, or trackless trolley within this state, if, at the time of the operation, any of the following apply:
(1) The person is under the influence of alcohol, a drug of abuse, or a combination of them.

7